RUTH K. COHEN, PLAINTIFF-APPELLANT, v. FIRST CAMDEN NATIONAL BANK & TRUST COMPANY, A BANKING CORPORATION OF THE UNITED STATES OF AMERICA, DEFENDANT-RESPONDENT.

Argued November 20, 1967—Decided December 27, 1967.

12

14

*Mr. Alexander Feinberg* for plaintiff-appellant (*Messrs. Evoy & Feinberg*, attorneys; *Mr. Malcolm L. Block* on the brief).

*Mr. James Hunter, III*, for defendant-respondent (*Messrs. Archer, Greiner, Hunter & Read*, attorneys; *Mr. W. Thomas Grimm* on the brief).

The opinion of the court was delivered by

PROCTOR, J. The plaintiff Ruth K. Cohen, as settlor and *cestui que trust*, brought this action to recover the assets of a trust fund held by defendant First Camden National Bank and Trust Company. The Bank was a co-trustee of the fund with Jack M. Cohen, the plaintiff's husband. The trustee Bank, acting under an assignment of the trust assets executed by Mrs. Cohen as collateral security for the payment of loans made by it to the co-trustee Jack M. Cohen, took possession of the funds for its own account upon the default in the repayment of the loans by Mr. Cohen. The Bank counterclaimed against Mrs. Cohen for the deficiency remaining due on the defaulted notes of Jack M. Cohen after the collateral was exhausted. After trial the Superior Court, Chancery Division, held that the assignment of collateral was effective and its acceptance by the Bank was not a breach of its fiduciary obligations. Accordingly, judgment was entered dismissing plaintiff's claim. The trial court dismissed the Bank's counterclaim, holding that Mrs. Cohen was under no personal obligation for the deficiency. The Appellate Division affirmed the judgment

in an unreported opinion. We granted plaintiff's petition for certification. 49 *N. J.* 371 (1967). The Bank does not complain of the dismissal of its counterclaim.

The plaintiff, a resident of Philadelphia, formerly was married to Harry Kelinson who died in 1957. After his death, she continued the operation of Mr. Kelinson's wholesale meat business in Philadelphia for a few months until the business was terminated because of operating losses. Jack M. Cohen, a Pennsylvania attorney, was retained by her to handle the administration of her husband's estate. In this capacity he received a power of attorney from the plaintiff, "individually and as executrix of the estate of Harry Kelinson." With Jack M. Cohen's advice, on May 28, 1958 the plaintiff executed an Indenture of Trust conveying the bulk of her assets to the defendant Bank and Jack M. Cohen as co-trustees. Plaintiff testified that for about a year prior to May 28 she had considered placing her assets in trust so that "my funds would be in safe hands if I ever decided to remarry again." The trust instrument provided that monthly payments of $150.00 were to be made to her and $100.00 was to be paid each month to her son. On the death of the plaintiff the trust assets were to be distributed to her son and daughter. Power to revoke or amend the trust was reserved by the plaintiff and she retained the right to instruct the trustees as to investments and administration. Until the transactions giving rise to this litigation, the trust apparently continued with no changes except an assignment of $15,000.00 made by the plaintiff on December 11, 1958 to secure a bond required in a claim against the Kelinson meat business. The assignment was executed by her with the advice of attorney Cohen and her son, and was limited to $15,000.00. The suit later was settled for $9,325.00 which was paid out of the trust assets.

On June 1, 1958, a few days after the execution of the trust instrument, the plaintiff married Jack M. Cohen. The present litigation stems from a transaction of January 27, 1960. On that date an instrument entitled an Assignment

of Collateral was executed bearing the signature of Ruth K. Cohen. The document reads as follows:

"For value received, I, Ruth K. Cohen * * * do hereby assign to First Camden National Bank and Trust Company of Camden, New Jersey, individually, all my right, title and interest in and to the corpus or principal assets of that certain trust established under deed made May 28, 1958, by me (then known as Ruth K. Kelinson) and of which said Bank and Jack M. Cohen are Trustees, of which I am now owner and over which I have the right of withdrawal, amendment and revocation, and against which there are no liens or claims of any kind, to be held by said First Camden National Bank and Trust Company as collateral security for the note of Jack M. Cohen for $9901.99/100 dated Jan. 27, 1960; and for all renewals of said note, or any part thereof, and the interest on said note and renewals, and for any and all other indebtedness due or to become due from said Jack M. Cohen, whether such indebtedness shall have been heretofore or shall be hereafter contracted, to said First Camden National Bank and Trust Company; and for the performance of any and all other terms and conditions of said note and indebtedness, with exactly the same rights and powers conferred by said note, or any renewals thereof, and by law over and concerning the collateral hereby assigned as said First Camden National Bank and Trust Company would have had if such collateral was the property of the maker of said note.

"I do further hereby provide that to such extent as may be necessary to accomplish the purposes hereof, this instrument is made an amendment to said deed of trust dated May 28, 1958, and shall be as such irrevocable by me unless and until release of said assignment is made by said Bank.

"Given under my hand and seal at Philadelphia, Pa. this 27th day of January, 1960."

According to James Whitall, the Vice-President of the Bank who handled the loans to Jack M. Cohen, the assignment was executed because Cohen, who then was indebted to the Bank, wished to borrow additional funds; the Bank was unwilling to lend him any further sums without his wife's signature or some form of collateral. The Bank's records show that Jack M. Cohen had been a frequent borrower from the Bank and at the time of the assignment was indebted to it in the sum of $7,500.00.

An additional assignment of collateral, similar in terms to the assignment of January 27, 1960, also was placed in

evidence. This document, dated "April 1961," bore the purported signature of Ruth K. Cohen which the Bank admitted was not written by her.

The $9,901.99 note mentioned in the assignment of January 27, 1960 subsequently was paid. After the January 27 assignment, the Bank made numerous loans of sizable amounts to Jack M. Cohen, many of which were evidenced by notes bearing the purported signature of Ruth K. Cohen as co-maker, which signature admittedly was not hers; she neither endorsed nor became a co-maker on any of Jack M. Cohen's notes. In August 1964, the indebtedness of Jack M. Cohen to the Bank totaled $92,750.00 on eight notes, all made by him during the preceding three months. Early in August Jack M. Cohen disappeared and his notes went into default. His present whereabouts remains unknown. Four of these notes bore the forged signature of Ruth K. Cohen as co-maker, another was endorsed by a third person, and the remaining three notes were signed by Cohen alone. The note endorsed by the third person, in the sum of $17,,500.00, was paid by the endorser. Acting under the assignment of collateral, the Bank, after notice to Mrs. Cohen, liquidated all the assets in the trust and applied the proceeds to the balance due on the notes.[1]

The Bank argues that under the trust indenture Mrs. Cohen had extensive control over the administration of the trust through her reserved right to revoke or amend the trust or to direct the trustees with respect to their powers and therefore the trust arrangement was "much closer to that of a managing agency or custodial account than to a true trust." Because of this, the Bank contends, it was obligated to carry out Mrs. Cohen's directions as an agent rather than as a trustee. We cannot subscribe to the sug-

---

[1] At the trial below the parties did not attempt to prove exactly either the amount in the trust account or the amount of the deficiency. The record reveals, however, that the Bank realized in the neighborhood of $60,000.00 on the liquidation of the trust assets, leaving a deficiency of about $14,000.00 on the notes.

gestion that the powers reserved by Mrs. Cohen relieved the trustee of any of the trust obligations which flow from the trust indenture. Mr. Whitall, the Vice-President, in his testimony readily acknowledged that the Bank, as co-trustee, had a responsibility to be certain that Mrs. Cohen was fully aware that she was assigning the trust *res* as collateral security for obligations to be incurred for the benefit of a co-trustee. So long as the trust continued, the trust fund and its beneficiaries were entitled to all the protection by the Bank that must have been envisioned at the establishment of the trust. The Bank, which prepared the formal and detailed "Indenture of Trust" cannot be heard to say now that the Bank was anything less than a trustee with all the fiduciary duties that position entails. The loans to Mr. Cohen could have been made directly out of the trust assets (by revoking the trust) with no greater risk to the assets than that to which they were exposed by the collateral assignment. This was not done, however, and it is probable that the reason was that Mrs. Cohen wished to have the continued protection of the trust arrangement. We conclude, therefore, that the Bank was a trustee with all the concomitant duties of that position and could be relieved of these duties only by an express termination of the trust in accordance with the procedure set forth in the trust indenture. Admittedly, this was never done.

Among the trust obligations owed by the Bank to Mrs. Cohen was the duty of unflagging and undivided loyalty. This standard of utmost fidelity forbids a trustee to occupy a position in which it has interests to serve which conflict with those of the trust estate. Here, the Bank utilized the trust assets to secure itself in a profitable transaction in which it engaged to obtain the interest on Jack M. Cohen's notes. The Bank permitted the trust assets to be exposed to a risk—which the Bank, according to its official, would not take with its own funds—so that the Bank itself might reap a profit. Clearly, the position of the Bank as trustee of, and at the same time creditor

secured by, the trust assets gave rise to a conflict of interest incompatible with its duty of undivided loyalty to its trust. For example, upon a default of the notes, the Bank would be faced with the dilemma of attempting to conserve the trust assets it was duty bound to protect and at the same time of attempting to protect itself by realizing on its security interest in the trust estate.

The acceptance by the Bank of the collateral assignment therefore subjected it to potential liability for breach of its fiduciary duties. This liability may be avoided only if it can be shown that Mrs. Cohen, as settlor and beneficiary, consented to the transaction with full knowledge of all relevant facts and complete awareness of the resultant divided loyalty and its possible consequences. See Bogert, *Trusts and Trustees* § 941 (*2d ed.* 1962) ; 2 *Scott on Trusts* § 216 (*2d ed.* 1956). Such transactions are regarded with suspicion by the courts and the burden of proof is upon the trustee to show by convincing evidence that the *cestui* consented to the breach of trust with full appreciation of what was being done :

"In order to bind a *cestui que trust* by acquiescence in a breach of trust by the trustee, it must appear that the *cestui que trust* knew all the facts, and was apprised of his legal rights, and was under no disability to assert them. Such proof must be full and satisfactory. The *cestui que trust* must be shown, in such case to have acted freely, deliberately, and advisedly with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which is material for him to know." *McAllister v. McAllister*, 120 *N. J. Eq.* 407, 413–414 (*Ch.*) *aff'd* 121 *N. J. Eq.* 265 (*E. & A.* 1936), quoted with approval, *Liberty Title & Trust Co. v. Plews*, 6 *N. J.* 28, 41–42 (1950).

The decisive issue therefore is whether the Bank has satisfied its burden of proving that at the time the collateral assignment of January 27, 1960 was signed by Mrs. Cohen, she was made fully aware of all the relevant facts and of

the consequences of the assignment. Mrs. Cohen testified that she did not recall signing the instrument. However, the proofs show beyond doubt that her signature on the document is genuine. Mr. Whitall testified that on January 27, 1960, after he told Jack M. Cohen that the Bank would lend him no additional funds without his wife's signature or some form of collateral, Mr. and Mrs. Cohen came to his office at the Bank in Camden. In their presence he telephoned an attorney in the Bank's trust department and asked him to prepare the assignment of collateral. The attorney prepared the assignment, delivered it to Whitall's office, and left making no attempt to explain the document to Mrs. Cohen. According to Whitall, Mr. Cohen read the assignment to Mrs. Cohen and in a joking way said, "You know what you are signing here? You are signing your life away." Mrs. Cohen laughed and responded, "Well, Jack, my life has been in your hands. I am your wife, and you have held my estate before. It is perfectly all right, if you say so."

▮ The Bank produced no evidence of Mrs. Cohen's understanding other than the described conversations in Mr. Whitall's office. Even though Mrs. Cohen is a woman of above average intelligence with some business experience, as the trial court found, we conclude that the Bank did not sustain its burden of proving that she had an awareness of the facts and circumstances legally sufficient for an effective consent to the breach of trust. The Bank urges that Mrs. Cohen must have overheard the instructions given in the telephone conversation between Mr. Whitall and the Bank's trust attorney and thus was informed of the nature of the instrument to be prepared for her signature. But the substance of the conversation, which may have been in general or technical terms, was not disclosed. Indeed, the Bank attorney testified that from the telephone instructions he understood only that Mrs. Cohen "was making an assignment of collateral for *a loan*" (emphasis added)—not the unlimited assignment which was prepared. In any event,

a telephone conversation with a third person, of which Mrs. Cohen heard only one side and to which she may not have been paying attention, is not the careful counselling which a trustee is required to give.

Nor do we find that the reading aloud of the document by Jack M. Cohen to Mrs. Cohen would bring home to her the consequences of the assignment in the absence of a detailed explanation. The language of the assignment, quoted above, focuses on one specific note, in the amount of $9,901.99. Throughout the instrument the reference is to "said note"—in the singular—an expression inconsistent with the assignment's broad coverage of an unlimited number of notes for unlimited amounts over unlimited time. The phrase relied upon for the pledging of the trust assets for all debts incurred or to be incurred by the co-trustee easily might escape the notice of one not versed in the law. This is particularly true of one who was relying on the advice of her co-trustees in whom she placed full confidence. The instrument itself was far from sufficient to warn Mrs. Cohen of the existence of the broad language contained therein and fell far short of apprising her of all the consequences to the trust estate which might flow from the use of the openended credit granted by the instrument. In addition, the effectiveness of the reading aloud of the instrument is open to some doubt since after the reading no one questioned the erroneous recitation in the assignment that it was signed by Mrs. Cohen and witnessed by Mr. Whitall in Philadelphia, Pennsylvania. It is undisputed that the execution of the instrument took place at the Bank offices in Camden, New Jersey.

The conversation which Mr. Whitall overheard between the Cohens following the reading aloud of the instrument certainly did not, as the Bank argues, alert Mrs. Cohen to the significance of the assignment. To the contrary, the conversation is persuasive that she was acting not "freely, deliberately, and advisedly" (*McAllister, supra,* 120 *N. J. Eq.,* at *p.* 414) but in reliance solely on Jack M. Cohen,

the co-trustee who, as the Bank was well aware, was to benefit from this breach of trust. Mrs. Cohen's statement just before signing the document, "It is perfectly all right, if you say so," is hardly that of one who is acting after knowledgeable deliberation.

There is no suggestion that any Bank official uttered even one word to Mrs. Cohen advising her of the consequences of the execution of the assignment. At all times the Bank looked only to its own protection, and made no effort to protect the interest of the plaintiff to whom it owed a duty of highest care. The Bank never told her that Jack M. Cohen had borrowed frequently from the Bank and at that time already was indebted to it in the sum of $7,500.00. Nor did it tell her that it was shifting to the trust estate the liability for loans which it considered too risky for the Bank to make without security. At no time was Mrs. Cohen informed by the Bank that it was contemplating a line of credit to Jack M. Cohen which she was to guarantee. Though the assignment mentioned specifically the note for $9,901.99 as the existing indebtedness to be secured, its broad language extending to prior debts encompassed the unrevealed debt of $7,500.00. Thus, unknown to Mrs. Cohen, the assignment at its execution secured not merely the $9,901.99 recited therein, but the total indebtedness of over $17,000.00. More importantly, the Bank never brought home to Mrs. Cohen the meaning of the broad language of the assignment which for an unlimited time permitted Jack M. Cohen, the co-trustee, to borrow—and the Bank to loan—funds on the pledge of the trust assets to their complete exhaustion. Thereafter, as Jack M. Cohen did borrow sizable sums which eventually exceeded the trust assets, the Bank at no time informed Mrs. Cohen that her trust estate increasingly was being jeopardized. As *cestui*, Mrs. Cohen certainly was entitled to be informed of important matters affecting the trust, such as the continued borrowing of Mr. Cohen. See Bogert, *supra*, § 961. Even had Mrs. Cohen at the time of the

assignment of January 27, 1960 been fully aware of the *possibility* that the trust assets might be depleted by further loans to Jack M. Cohen, her consent to the breach of trust at that time would not be effective for future loans unless she were notified that these loans actually were being made and were imperiling the trust estate. In fact, at no time after January 27, 1960 did the Bank inform her of the making of a single loan. Mrs. Cohen hardly can be said to have given her consent "freely, deliberately, and advisedly" to the making of loans about which she knew nothing. Finally, at no time did the Bank explain to Mrs. Cohen that, to the extent of her husband's loans, she could no longer rely on the Bank to protect the trust estate. The nature of the transaction was such that Mrs. Cohen may well have been lulled into a false sense of security by a belief that because the funds were in a trust estate they were not exposed to the same risk which would arise were they loaned outright. The Bank, therefore, should have explained to Mrs. Cohen that in the event of a default on the notes, the effect to her funds would be the same as though they had been loaned directly rather than pledged as collateral.

The Bank concedes that the second assignment, dated April 1961, and the several notes bearing Mrs. Cohen's name were not signed by her. Although no proof was offered to show who had signed her name to these documents and whether the same person wrote her name on all, Mr. Whitall testified that on one occasion he saw Jack M. Cohen sign Mrs. Cohen's name to an unidentified note. When questioned about this, Cohen told Whitall he was acting under a power of attorney given him by Mrs. Cohen. Subsequently he delivered to the Bank a copy of the power of attorney given him by Mrs. Cohen in connection with the Kelinson estate. The Bank argues that this power of attorney empowered Mr. Cohen to bind the plaintiff by the signature on the assignment of April 1961 and the notes. Although it may be suspected that Jack M. Cohen wrote Mrs. Cohen's name on these instruments, there is no nota-

tion thereon that he signed them as attorney in fact for Mrs. Cohen nor is there any evidence that he actually did write her name on the four defaulted notes on which her name appears. Moreover, even if Jack M. Cohen did write Mrs. Cohen's name on the documents, we agree with the trial court that the power of attorney was limited to the administration of the Kelinson estate and created no power in Mr. Cohen to bind the plaintiff on either the notes or the assignment.

We conclude, therefore, that the Bank has failed to sustain its burden of proving that the assignment to it by Mrs. Cohen of her trust assets as collateral for loans to be made to Jack M. Cohen was a consent "freely, deliberately, and advisedly" given to a breach of the Bank's trust obligation. Accordingly, the judgment of the courts below is reversed and the case is remanded to the trial court for the entry of a judgment in accordance with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For affirmance*—None.